IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

AGUSTIN LOPEZ-COLLAZO,
a/k/a Agustin Martinez-Lopez,
a/k/a Agustin Lopez,

*Defendant.*

Crim. Action No. ELH-14-00486

## MEMORANDUM OPINION

In October 2014, a federal grand jury returned a one-count indictment against Agustin Lopez-Collazo, charging him with illegal reentry into the United States, without consent, after having been previously removed from the country following conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) & (b)(2).  ECF 1.  Pursuant to 8 U.S.C. § 1326(d), Lopez-Collazo filed a Motion to Dismiss the Indictment, ECF 14 ("Motion" or "Motion to Dismiss"), with exhibits.  In the Motion, which is a collateral attack on the prior order of removal, defendant maintains that he can establish the three elements required by 8 U.S.C. § 1326(d).

The Government opposes the Motion, ECF 24 ("Response") and has submitted exhibits.  Defendant has replied.  ECF 25 ("Reply").  And, with the consent of the Court, the Government supplemented its opposition to the Motion, ECF 36 ("Supplemental Response"), to which defendant responded.  ECF 37 ("Supplemental Reply").

In addition, defendant has filed a Motion to Suppress Tangible and Derivative Evidence and Statements, ECF 13 ("Motion to Suppress").  The Government responded in ECF 24, and defendant replied.  ECF 25.

The Court held an evidentiary motions hearing on April 23, 2015, *see* ECF 39, and heard oral argument on April 30, 2015.  *See* ECF 43.[1]  For the reasons that follow, I will grant the Motion to Dismiss.  And, because I will grant defendant's Motion to Dismiss, I need not decide defendant's Motion to Suppress.

## I.  Factual Background[2]

### A.  Defendant's Entry to the United States & Maryland State Convictions

Lopez-Collazo was born in 1982 (ECF 24-5 at 2, 20) and is a citizen of Mexico.  Defendant's native language is Spanish, ECF 25-5 at 3, and he has an eighth grade education.  *See* ECF 24-4 at 6-7.  Lopez-Collazo first entered the United States approximately sixteen years ago, at the age of sixteen.  *See* Supplemental Reply, ECF 37 at 10.  It appears that he entered without inspection, *i.e.*, without permission.

On January 7, 2005, Lopez-Collazo pled guilty, in the Circuit Court for Talbot County, Maryland, Case No. K-04-8063, to Theft Under $500, in violation of Md. Code (2005 Supp.), § 7-104 of the Criminal Law Article ("C.L.").  *See* ECF 24-5 at 14 (Maryland Sentencing Guidelines Worksheet); ECF 24-5 at 13 (Certificate of Presiding Judge).  C.L. § 7-104 is titled "General theft provisions."  It criminalizes a variety of means in which to commit the offense of

---

[1] For reasons not pertinent to this Memorandum Opinion, there were unexpected, brief delays in regard to the dates for the hearings.  Trial was scheduled to begin on May 11, 2015, necessitating a prompt decision as to the motions.

[2] Both sides introduced exhibits at the evidentiary hearing. *See* ECF 41 (Government), ECF 42 (defense).  Some of these exhibits duplicated earlier pre-hearing submissions.  For convenience, I will cite only to the pre-hearing submissions, to which no objections were lodged.

theft, including "unauthorized control over property"; "unauthorized control over property by deception"; "possessing stolen personal property"; "control over property, lost, mislaid or delivered by mistake"; and "services available only for compensation."

The exhibits show that, on January 7, 2005, with the aid of an interpreter, defendant completed a written form titled "Examination of Defendant Prior to Acceptance of Guilty Pleas" ("Examination"), ECF 24-5. The Examination constituted the plea colloquy. Question 6 asked: "Can you understand, read and write the English language?" ECF 24-5 at 3. Lopez-Collazo answered: "No—Spanish is my native language. I have an interpreter present." *Id.* Question 14 specified the charge to which defendant pleaded guilty. It merely lists the case number, the count, the offense, *i.e.*, "Theft Less Than $500.00," and the maximum penalty. *See also* Question 28, ECF 24-5 at 8. Question 37 asked: "Do you wish to plead guilty because you are in fact guilty, because you believe it is in your best interest to plead guilty or for both of these reasons?" ECF 24-5 at 11. Defendant answered: "It is in my best interest." *Id.*

Defendant's attorney certified that the guilty plea was knowing and voluntary. ECF 24-5 at 12. In addition, the presiding judge, William Horne, certified that he "reviewed in detail all contents of this form orally with the Defendant."[3] ECF 24-5 at 13. Further, he determined that defendant's plea to the charge in paragraph 14 of the Examination was knowing and voluntary. The judge also found a factual basis for the plea, based on "hearing a statement of facts . . . ." ECF 24-5 at 13 ¶ 4. However, nothing in the plea documents submitted by the Government shows the factual basis for defendant's plea. *See* ECF 24-5 at 2-14.

---

[3] It is not entirely clear what is meant by "this form." Nor does the record contain any documentation of the oral review conducted by the judge.

According to the applicable Maryland Sentencing Guidelines Worksheet, Lopez-Collazo's plea was tendered in relation to an offense committed on October 16, 2003. *See* ECF 24-5 at 14. The "Statement of Probable Cause," which does not appear as part of the plea colloquy, alleges that defendant cashed a forged check on October 16, 2003. *See* ECF 36-1 at 2 (Statement of Probable Cause); *see also* Response, ECF 24 at 1.

At the time of his guilty plea, Lopez-Collazo had no prior record. *Id.* at 14. He was sentenced to eighteen months imprisonment, with the suspension of all but time served from July 8, 2004, and three years of probation. *Id.* at 14, 18 (Probation/Supervision Order). In addition, Lopez-Collazo was ordered to pay restitution in the amount of $437.00. *Id.* at 15 (Restitution Order).

Sometime in 2006, Lopez-Collazo "and his U.S. citizen girlfriend had their first child, who is also a U.S. citizen." Supplemental Reply, ECF 37 at 10. In addition, "[s]he had a toddler from a prior relationship whom [defendant] was raising as his own." *Id.*

On December 1, 2006, Lopez-Collazo and his brother were involved in an altercation in Dorchester County, Maryland with officers of the Cambridge Police Department. ECF 24-4 at 11 ("Plea Colloquy & Sentencing"). Thereafter, on May 10, 2007, defendant appeared with counsel in the Circuit Court for Dorchester County, Maryland, in Case No. 09-K-07-012557, and pled guilty to Assault in the Second Degree under Md. Code (2007 Supp.), C.L. § 3-203. *See* ECF 24-3 at 1, 4 (Case History); Plea Colloquy & Sentencing, ECF 24-4. C.L. § 3-203(a) states: "A person may not commit an assault." Section 3-203(c)(3) provides that assault in the second degree of a law enforcement officer is a felony under State law, subject to a higher fine than

assault of persons who are not law enforcement officers.  Lopez-Collazo also pled guilty to driving without a license.  ECF 24-3 at 5.

The plea colloquy was conducted in English, with the aid of an interpreter.  ECF 24-4 at 5, 7.  It appears that Lopez-Collazo answered requests for his name, home address, and age in English, on his own behalf.  *Id*. at 6.  However, he answered the remainder of the questions through an interpreter.  ECF 24-4.

During the plea colloquy, the prosecutor set forth the facts the State would have proved if the case went to trial, as follows, ECF 24-4 at 10-11:

> [O]n December 1st, 2006 Officers of the Cambridge Police Department responded to 501 Maryland Avenue for a fight.  The Police would later learn that that was related to an attempted theft from the business at that location.
>
> As Officers arrived at that location the Defendant Agustin Lopez entered a vehicle behind the driver's—in the driver's seat and locked the doors.  As Officers approached the vehicle Mr. Lopez put the vehicle into drive and attempted to leave that location in the direction of Corporal David Satterfield.  The Officer fearing for his safety was forced to jump out of the way of the vehicle.  Another Officer entered the vehicle through a passenger side window and placed the vehicle into park to stop the vehicle.
>
> Officers then pulled Mr. Lopez from the vehicle in an attempt to place him under arrest.  And while doing so the Officers would testify that Mr. Lopez resisted that arrest by attempting to kick and strike them with his hands.  Officer Satterfield would testify that he did not consent to being struck by the Defendant.
>
> He would also testify that they later caused a Motor Vehicle Administration check to be done on Mr. Lopez's license status.  And they would learn that he has in fact no Maryland Driver's License.
>
> The Officers would testify that the Defendant Agustin Lopez is the person who struck him and did not have a driver's license.  And those events occurred in Dorchester County.

During Lopez-Collazo's sentencing on the assault and license convictions (counts Five and Eleven), conducted the same day (May 10, 2007), the prosecutor stated that Lopez-Collazo's

codefendant, Toro Lopez-Collazo, "had actually engaged in the assault on the Officers in the same episode" and, according to the prosecutor, "to a more serious degree … ."  ECF 24-4 at 12.  He added that the codefendant was sentenced in State district court to three months for resisting arrest and sixty days "on a theft count," and he requested for Lopez-Collazo a "sentence not to exceed that of the Codefendant."  ECF 24-4 at 12.

During the same sentencing, Lopez-Collazo's attorney stated, *id.* at 12-14:

> Your honor, I believe that that day there was a great deal of confusion.  And Mr. Lopez's brother was at the time with Mr. Lopez.  And the brother took beers and put them down his pants and attempted to steal them and remove them from the store without paying for them.  Mr. Lopez the Defendant saw his brother doing this.  And Mr. Lopez had come to purchase beer which he did so.  And he went out to his car.

> And it's my understanding that all he wanted to do was basically leave and not to be involved with what his brother was doing.  And I'm not sure if the police thought he was the individual who had stolen the beer or not.  And I wonder about that just because they actually—the police took the beer that Mr. Lopez had purchased and took it back to the store and returned it to the Clerk.  So I think there may have been some confusion about what his involvement was inside the store as well.  But I think having had an opportunity to reflect on it, it would have been better to stay there and speak to the police and clarify it rather than attempting to leave.

> There was apparently a struggle because he was pulled from his car.  And there was a struggle with police and Mr. Lopez actually received a broken nose and had to go to the hospital for treatment which I think also taught him probably a valuable lesson about how to interact with the police.

> But Mr. Lopez has been in a relationship with Ms. King who is present today as is her essentially her stepfather.  They have two children together.  He works very hard.  He works—currently he's working at Chesapeake House doing pretty much it sounds like anything they ask him to do as far as work in the kitchen or work on the grounds or whatever.  And both Ms. King and her stepfather have told me that he is a very good father and spends a good deal of time with his children and helps to take care of them. …

On his own behalf, through the aid of an interpreter, Lopez-Collazo stated: "I just want to say that I was not trying to do anything wrong. All I wanted to do was just the place [sic] and go with my children. Is all I wanted to do is spend time with my kids and take care of them. That's all." ECF 24-4 at 15.[4]

Lopez-Collazo was sentenced to eighteen months imprisonment, with all but seventy-two days suspended, and placed on eighteen months probation. ECF 24-3 at 26 (Probation/Supervision Order).

## B. Removal Proceeding, Reentry, Detainer & Indictment

Deportation Officer Patrick J. Kearns testified at the motions hearing. *See* ECF 48 ("Apr. 23 Hearing Transcript"), at 10-82.[5] Kearns is employed by the Office of Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security. *Id*. at 10. In 2007, he was assigned to the Criminal Alien Program in Salisbury, Maryland. *Id*. at 12. His duties included the identification of foreign nationals in detention centers on the Eastern Shore of Maryland. *Id*. at 11. At the time, he was the sole deportation officer in that area, and he handled eight detention facilities. *Id.* at 12.

As part of his duties, Kearns routinely checked inmate rosters at various detention centers, ran record checks, and attempted to determine the status of non-citizens, *i.e.*, whether

---

[4] It appears this statement was made through an interpreter because it does not contain the notation "(In English)" like some of Lopez-Collazo's earlier statements during the colloquy. *Compare* ECF 24-4 at 15 *with id*. at 6.

[5] While I prepared the Memorandum Opinion, I did not have transcripts of the testimony or the arguments presented at the motions hearings. Therefore, when referring to testimony adduced at the hearing, I relied on my notes. However, a transcript of the hearing held on April 23, 2015, was docketed on May 11, 2015, shortly before I had planned to file this Memorandum Opinion. *See* ECF 48. Therefore, I have briefly delayed filing in order to verify my notes, to add citations to the transcript for the hearing held on April 23, 2015, and to add quotations from the testimony, where appropriate.

they were in the United States legally.  ECF 48 at 12-13.  While defendant was in custody at the Dorchester County Detention Center, Officer Kearns learned of defendant's incarceration and his prior record.  *Id*. at 14-17.  He also determined that defendant had entered the country illegally. *Id*. at 20.

Officer Kearns testified that he is now, and was in 2007, proficient in Spanish.  *Id*. at 19-20.  He explained that it was his practice in 2007, as it is now, to converse with native Spanish speakers in Spanish, regardless of the individual alien's English abilities.  *Id*. at 19, 52, 75. Although he could not recall any details regarding Lopez-Collazo's English language abilities at the time of their first encounter in 2007, he stated he would have interviewed defendant in Spanish.  *Id*. at 18-19, 49.

On or before June 7, 2007, Officer Kearns prepared a "Notice of Intent to Issue a Final Administrative Removal Order."  *Id*. at 45-46; ECF 14-1 ("Notice of Intent" or "NOI").  It was addressed to Lopez-Collazo, all in English. ECF 14-1.[6]  The Notice of Intent stated that ICE had determined that Lopez-Collazo was "amenable to expedited administrative removal proceedings," pursuant to "section 238(b) of the Immigration and Nationality Act … [("INA")], 8 USC 1228(b) … ."  *Id*.  It also alleged that Lopez-Collazo was not a U.S. citizen, that he was a native and citizen of Mexico, and that he entered the "United States at or near an unknown place, on or about an unknown date," without admission or inspection.  *Id*.  Further, the NOI alleged that Lopez-Collazo was convicted on May 10, 2007, of "the offense of Assault in the 2nd

---

[6] The signature of the ICE officer is illegible.

degree," in violation of C.L. § 3-203, and convicted on October 16, 2003,[7] of "Theft (less $500 value)," in violation of C.L. § 7-104.  *Id.*

The Notice of Intent charged defendant as deportable under 8 U.S.C. § 1101(a)(43)(F) and (G).  ECF 14-1 at 1.  Title 8 U.S.C. § 1101(a)(43)(F) establishes that a "crime of violence (as defined in section 16 of title 18 of the United States Code … ", with a term of imprisonment of at least one year, is an "aggravated felony" under the INA.  Title 8 U.S.C. § 1101 (a)(43)(G) establishes that a "theft offense … or burglary offense" with a term of imprisonment of at least one year is an "aggravated felony" under the INA.  The charges were predicated on the allegations described, respectively, for Second-Degree Assault and Theft Under $500.  ECF 14-1.  At the bottom of the "Charges" section, the Notice of Intent stated that ICE served the NOI "without a hearing before an Immigration Judge," pursuant to "section 238(b)" of the INA.  *Id.*

In addition, the Notice of Intent contained an explanation of Lopez-Collazo's "Rights and Responsibilities."  ECF 14-1.  That section stated, in part, *id.*:

> You must respond to the above charges in writing to the Service address provided below within 10 calendar days of service of this notice (or 13 calendar days if service is by mail).  In your response you may: request, for good cause, an extension of time; rebut the charges stated above (with supporting evidence); request an opportunity to review the government's evidence; admit deportability; and/or designate the country to which you choose to be removed … .

> You may seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order is issued, or you may waive such appeal by stating, in writing, your desire not to appeal.

---

[7] The NOI is factually incorrect as to the date of the theft conviction.  As discussed, Lopez-Collazo pled guilty to Theft Under $500 on January 7, 2005.  The offense occurred on October 16, 2003.  *See* ECF 24-5 at 14.

A box titled "Certificate of Service" indicates that Lopez-Collazo was personally served with the Notice of Intent on October 5, 2007.  ECF 14-1.  At the evidentiary hearing, Officer Kearns testified that his colleague, Kevin J. Towey, served Lopez-Collazo with the Notice of Intent.  ECF 48 at 23-24; *see also* ECF 24-2; ECF 25-5 at 2 (showing full name of Officer Towey).  It appears that Officer Towey signed the Certificate of Service.  ECF 14-1.  Of import here, the NOI indicates that Officer Towey "explained and/or served [the] Notice of Intent to the alien in the English language."  *Id.*  Officer Kearns stated that Officer Towey is able to communicate in Spanish, but Officer Kearns did not classify his colleague's skill level.  ECF 48 at 50.  When asked if Towey "speaks Spanish proficiently," Kearns responded:  "He is—I don't want to classify how he speaks Spanish, but he can communicate in Spanish."  *Id.*

The Government did not call Officer Towey as a witness at the hearing.  However, Towey remains an employee of the agency.  *Id.* at 83.  Kearns acknowledged that he talked to Towey about this case.  *Id.* at 25.

The NOI is a two-sided document.[8]  ECF 48 at 24.  The back side of the Notice of Intent contains four boxes with text.  *See* ECF 25-5 at 2 ("Waiver").  The first is titled, in bold letters: "**I ACKNOWLEDGE THAT I HAVE RECEIVED THIS NOTICE OF INTENT TO ISSUE A FINAL ADMINISTRATIVE REMOVAL ORDER**." *Id.*  It includes signature and date lines for a "respondent" and an "Officer."  *Id.*  Both Lopez-Collazo and Officer Towey signed on October 5, 2007.  *Id.*

The second text box is titled:  "**I Wish To Contest**."  ECF 25-5 at 2.  It contains four statements, each with a corresponding checkbox next to it.  The four statements are:  "I am a

---

[8] The first page of the NOI is filed at ECF 14-1.  The second page of the NOI is filed at ECF 25-5 at 2.

citizen or national of the United States"; "I am a lawful permanent resident of the United States"; "I was not convicted of the criminal offense described in allegation number 6 above"; "I am attaching documents in support of my rebuttal and request for further review." *Id.* Allegation number 6 in the Notice of Intent pertained only to Lopez-Collazo's conviction for Second-Degree assault. ECF 14-1. The second text box is blank. ECF 25-5 at 2. In other words, no check marks were placed next to any of the four statements.

The third text box is titled: "**I Do Not Wish To Contest**." It includes two statements, each with a checkbox next to it. ECF 25-5 at 2. The first statement says, *id.*:

> I admit the allegations and charge in this Notice of Intent. I admit that I am deportable and acknowledge that I am not eligible for any form of relief from removal. I waive my right to rebut and contest the above charges and my right to file a petition for review of the Final Removal Order. I wish to be deported to … Mexico … .

The second statement says: "I also waive the 14 day period of execution of the Final Removal Order." ECF 25-5 at 2. The checkboxes next to both statements in the third text box were checked, and both Lopez-Collazo and Officer Towey signed inside the third text box, with the same date as the date of service of the Notice of Intent, October 5, 2007. *Id.* The fourth text box provides an address for return of the form to ICE. *Id.*

In an Affidavit submitted to this Court, Lopez-Collazo avers that he spoke "very little" English in 2007. ECF 25-5 at 1.[9] With respect to the Waiver itself, Lopez-Collazo also asserts that the Waiver "was never translated into Spanish"; that he "did not understand what he was

---

[9] Although Lopez-Collazo did not testify at the motions hearing, the Government stipulated that the Court could consider Lopez-Collazo's Affidavit as evidence and accord it whatever weight the Court believes it deserves. As noted, defendant required the aid of an interpreter at two State criminal proceedings. This favors crediting defendant's sworn assertions in his Affidavit regarding his inability to communicate in English at the relevant time.

signing"; and he did not know that he "had a right to challenge" the Removal Order. *Id*. Rather, he states: "I believed I was just signing a document I was required to sign by a government official." *Id*.

Officer Kearns testified that he is not familiar with the so-called categorical approach used by courts to determine whether a particular criminal offense constitutes an aggravated felony under the INA. ECF 48 at 44-45. He submitted certain State court documents and Lopez-Collazo's records of conviction to ICE's Office of Chief Counsel for review as to the legal sufficiency of the charges and removal. *Id*. at 21, 43-44, 79-80. However, he did not submit the guilty plea transcripts for either conviction. *Id*. at 82.

On October 19, 2007, ICE issued a "Final Administrative Removal Order" addressed to Lopez-Collazo. Removal Order, ECF 14-2. The Removal Order was signed by Marion Dillis, "Deputy Field Office Director" for ICE. *Id*. In the Removal Order, Dillis stated, *id.*:

> Based on the allegations set forth in the Notice of Intent to Issue a Final Administrative Removal Order and evidence contained in the administrative record, I … make the following findings of fact and conclusions of law. … I … find that you have a final conviction of an aggravated felony as defined in sections 101(a)(43)(F) and 101(a)(43)(G) of [the Immigration and Nationality Act], *and are ineligible for any relief from removal* that the  Attorney General may grant in an exercise of discretion.  *I further find that the administrative record establishes by clear, convincing, and unequivocal evidence that you are deportable as an alien convicted of an aggravated felony* pursuant to . . . 8 U.S.C. § 1227(a)(2)(A)(iii) (Emphasis added).

Neither defendant nor the Government has submitted a copy of the administrative record on which Director Dillis relied.

Lopez-Collazo was removed from the United States to Mexico in November 2007. Response, ECF 24 at 2. In 2008, after defendant was removed, his girlfriend gave birth to their second child, a United States citizen. Reply, ECF 37 at 10.

- 12 -

Lopez-Collazo reentered the United States without inspection sometime between his removal in November 2007 and June 2014.[10]   On June 13, 2014, Lopez-Collazo was arrested in Dorchester County, Maryland "and charged with DUI, among other charges." Motion to Suppress, ECF 13 at 1.

At the motions hearing on April 23, 2015, Officer Kearns testified that, during a weekend in June 2014, he was working in Ocean City, Maryland, again checking jail rosters on the Eastern Shore, and came upon defendant's name.   ECF 48 at 29.   At the time, defendant was in custody on the DUI charge.   *Id.*; ECF 13 at 1.   Officer Kearns ran a check of defendant's name. ECF 48 at 29.   Although Kearns did not initially recognize defendant's name, Kearns's involvement with defendant "came back" to Kearns when he pulled defendant's records.   *Id.* at 30.   Defendant's records did not reflect that he had permission to reenter the United States, and such permission would have been required, according to Kearns, because of the prior removal in 2007.   *Id.* at 32-34.   As a result, Officer Kearns obtained an ICE detainer that was lodged against defendant.   *Id.* at 34.

"[O]n August 18, 2014, Lopez-Collazo pled guilty to DUI,"[11] and he was sentenced to 60 days incarceration …," which defendant notes "was essentially a time-served sentence."   Motion to Suppress, ECF 13 at 1; *accord* Response, ECF 24 at 3.   On August 20, 2014, after Lopez-

---

[10] In a sworn statement given to ICE by Lopez-Collazo on August 20, 2014, Lopez-Collazo stated that he illegally reentered the United States "in July 2008 through Arizona by walking through the desert."   ECF 24-1 at 3.   Defendant has moved to suppress this statement. ECF 13.

[11] The record does not show in what court defendant pled guilty.   However, the plea was likely entered in the District Court for Dorchester County, because defendant was arrested and detained in Dorchester County.

Collazo was released from State custody, ICE took Lopez-Collazo into custody, pursuant to the detainer lodged against him on June 14, 2014.  ECF 48 at 34-35; Reply, ECF 25 at 16; ECF 24 at 3.  As noted, in October 2014 a federal grand jury indicted Lopez-Collazo on the charge of illegal reentry, in violation of 8 U.S.C. § 1326(a) & (b)(2).  ECF 1.

At the motions hearing on April 23, 2015, defendant presented the testimony of Thomas J. Ragland, Esquire, an expert with impressive credentials in the field of immigration law and practice.[12]  In his Affidavit (ECF 25-4) and on the stand, Ragland recounted that he has been practicing immigration law exclusively for twenty years, including ten years as an attorney with the United States Department of Justice and ten years in private practice, devoted exclusively to immigration law.  *See* ECF 25-4 at 1; Apr. 23 Hearing Transcript, ECF 48 at 90-91.  For eight of his ten years with the federal government, Ragland worked as an attorney with the Board of Immigration Appeals, including three years as a supervisor.  ECF 48 at 88-89.  He has argued or briefed immigration cases before almost every federal court of appeals.  *Id*. at 92.

Ragland testified that, but for ICE's characterization of defendant's convictions as aggravated felonies, defendant would have been eligible for a form of discretionary relief available under the INA, known as "voluntary departure."  ECF 48 at 109-112; *see* 8 U.S.C. § 1229c(a) (pre-order voluntary departure) *and* § 1229c(b) (post-order voluntary departure).  *See also Dada v. Mukasey*, 554 U.S. 1, 8 (2008) ("Voluntary departure is a discretionary form of relief that allows certain favored aliens—either before the conclusion of removal proceedings or after being found deportable—to leave the country willingly.").  He explained that, if an alien

---

[12] The Government objected to the testimony of Ragland, largely based on the claim of lack of notice as to his testimony.  ECF 48 at 95-96.  The Government also suggested his testimony was not necessary, because the defense had submitted his Affidavit.  *Id.* at 95-96, 98.

obtains pre-order voluntary departure, the alien is able to leave the country of his own accord, without entry of an order of removal.  ECF 48 at 105, 107.  In Ragland's experience, pre-order voluntary departure is not "hard to get."  *Id*. at 106.  Indeed, Ragland characterized it as "the lowest hanging fruit of discretionary relief," *id.* at 108, a sort of "lazy request" for immigration attorneys to seek.  *Id*. at 134.  On the basis of the record concerning defendant, Ragland thought defendant would have had "a good pre-order voluntary departure request" and Ragland felt "fairly confident" that, based on applicable factors, defendant would have been awarded that relief.  ECF 48 at 112; *see also id.* at 143.

Defendant also submitted quantitative evidence that in 2007 the great majority of aliens in enforcement proceedings "accepted an offer to return to their home countries without a removal order."  Department of Homeland Security, Office of Immigration Statistics, "Immigration Enforcement Actions: 2007," *Annual Report* (Dec. 2008), at ECF 37-1 at 1.  *See also* ECF 48 at 150-153.  According to the exhibit, approximately 891,000 of the 1.2 million aliens who left the country during enforcement proceedings in 2007 accepted such an offer.  ECF 37-1 at 1 (showing that "more than 319,000 aliens were removed from the United States" in 2007 and "[m]ore than 891,000 … accepted an offer to return to their home countries without a removal order … ").  However, the report further states that "[a]bout 83 percent of [those voluntary] returns involved Mexican or Canadian alien nationals who were apprehended by the Border Patrol," at the border.  *Id*. at 4.  Thus, the number does not reflect the likelihood of an immigration judge granting voluntary departure in the context of removal proceedings.  *Id.*

## II.  Discussion

### A.  Collateral Attack Under 8 U.S.C. § 1326

Title 8 U.S.C. § 1326(a) provides, in relevant part, that "any alien who—(1) has been denied admission, excluded, deported or removed …, and thereafter (2) enters, attempts to enter or is at any time found, in the United States, unless … the Attorney General has expressly consented ... shall be fined under Title 18, or imprisoned not more than 2 years, or both."[13] Subsection (b)(2) provides that any alien "whose removal was subsequent to a conviction for commission of an aggravated felony … shall be fined …, imprisoned not more than 20 years, or both; … ."  And, Congress has defined what it means by "aggravated felony."  8 U.S.C. § 1101(a)(43).  A lawful prior order of deportation or removal is an element of the offense of illegal reentry under 8 U.S.C. § 1326.  *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987); *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005); *Smith v. Ashcroft*, 295 F.3d 425, 431 (4th Cir. 2002).

In *United States v. Mendoza–Lopez*, 481 U.S. at 831, the respondents moved to dismiss indictments charging illegal reentry, on the ground that their joint deportation hearing was fundamentally unfair.  They complained that the Immigration Law Judge inadequately informed

---

[13]  Specifically, the statute pertains to "any alien who … has been denied admission, excluded, deported or removed or has departed the United States while an order of exclusion, deportation or removal is outstanding … ."  8 U.S.C. § 1326(a)(1).   Prior to changes in the INA enacted in 1997, "the law distinguished between 'deporting' resident aliens who were currently in the United States and 'excluding' resident aliens who left the country for a short time and then sought re-entry."  *Jurado-Gutierrez v. Greene*, 190 F.3d 1135, 1140 n.2 (10th Cir. 1999), *as amended on denial of reh'g* (Nov. 29, 1999).  In 1997, Congress "eliminated this distinction and classified both actions as 'removal' procedures."  *Id.*

them of their right to counsel and accepted "unknowing waivers of the right to apply for suspension of deportation.[]" *Id.* at 831.[14]

The Supreme Court determined that, when an alien is charged with criminal reentry, due process requires that an alien must be able to challenge the lawfulness of a prior order of deportation if, *inter alia*, the alien was deprived of judicial review.  The *Mendoza-Lopez* Court reasoned, *id*. at 837-39 (internal citations and footnotes omitted) (emphasis in original):

> Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding. This principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense. … Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.

The Government-petitioner asked the Court "to assume that respondents' deportation hearing was fundamentally unfair," and the Court "accept[ed] the legal conclusions of the court below that the deportation hearing violated due process," because the Immigration Judge failed

---

[14] The Supreme Court explained "suspension of deportation" as follows, *Mendoza-Lopez*, 481 U.S. at 831 n.3:

> Suspension of deportation is a discretionary remedy providing relief from deportation.  The statutory section applicable to respondents makes the remedy available to a deportable alien who has been physically present in the United States for at least seven years, who was during that time a person of good moral character, and whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or his spouse, parent, or child, who is a United States citizen or an alien lawfully admitted to the United States for permanent residence.  8 U.S.C. § 1254(a).  Suspension of deportation not only provides relief from deportation, but enables the alien to adjust his status to that of an alien lawfully admitted for permanent residence.  *Ibid.*

to "explain adequately [respondents'] right to suspension of deportation or their right to appeal." *Mendoza-Lopez*, 481 U.S. at 839-40.  Thus, the Supreme Court did not define what defects an alien could show to prove that the prior deportation proceeding was fundamentally unfair.  The Court also expressly declined "to enumerate which procedural errors are so fundamental that they may functionally deprive the alien of judicial review, requiring that the result of the hearing in which they took place not be used to support a criminal conviction."  *Id*. at 839 n.17.  It did, however, note that "in the context of criminal proceedings, some errors necessarily render a trial fundamentally unfair," such as "use of coerced confession, adjudication by a biased judge," "mob violence, [and] knowing use of perjured testimony."  *Id*.  It added:  "While the procedures required in an administrative proceeding are less stringent than those demanded in a criminal trial, analogous abuses could operate … to deny effective judicial review of administrative determinations."  *Id*.

Ultimately, the Court determined that the Government could not rely on respondents' prior orders of deportation "as reliable proof of an element of a criminal offense."  *Id.* at 840.  In its view, "the waivers of [respondents'] rights to appeal," which were entered at their deportation hearing, "were not considered or intelligent," in light of the Immigration Judge's failure to "advise respondents properly of their eligibility to apply for suspension of deportation" and the judge's acceptance of waivers that "were not the result of considered judgments."  *Id*.  *See also Smith*, 295 F.3d at 431 ("The Court concluded [in *Mendoza-Lopez*] that since *lawful* deportation was a material element of the statutory offense, due process required, in this limited situation, a pretrial review of whether the prior deportation order was lawful.") (Emphasis in original).

In 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.

L. 104-132, Title IV, § 441(a), 110 Stat. 1214 (1996), Congress effectively codified the collateral

attack test established by *Mendoza-Lopez*, at 8 U.S.C. § 1326(d); *see United States v. Wilson*,

316 F.3d 506, 515 n.1 (4th Cir. 2003) (Motz, J., concurring).  The statute states:

> In a criminal proceeding under this section, an alien may not challenge the
> validity of the deportation order described in subsection (a)(1) of this section or
> subsection (b) of this section unless the alien demonstrates that-- (1) the alien
> exhausted any administrative remedies that may have been available to seek relief
> against the order; (2) the deportation proceedings at which the order was issued
> improperly deprived the alien of the opportunity for judicial review; and (3) the
> entry of the order was fundamentally unfair.

As the text of the subsection makes clear, "a defendant must satisfy all three

[requirements] in order to prevail" on a challenge to the validity of the prior order.  *El Shami*,

434 F.3d at 663 (citation omitted).  "However, if the defendant satisfies all three requirements,

the illegal reentry charge must be dismissed as a matter of law."  *Id*.

## B.  Section 1326(d) Elements One & Two

Lopez-Collazo offers three arguments in support of his contention that he has established

the first two elements of § 1326(d).

First, Lopez-Collazo argues that he "exhausted the administrative remedies available to

him" because "he effectively did not have any" administrative remedies available to him.  ECF

14 at 6.  He relies, *inter alia*, on a decision of the Fifth Circuit, *Valdiviez-Hernandez v. Holder*,

739 F.3d 184, 187 (5th Cir. 2013), which he accurately describes as "holding that an alien did

not have any administrative remedies to exhaust in his expedited removal proceedings [under 8

U.S.C. § 1228] because he could not challenge the legal determination that his conviction was an

aggravated felony" under the applicable regulations, at 8 C.F.R. § 238.1(d)(2)(i),(ii).  ECF 14 at

6-7.  Rather, the permitted challenges on the applicable waiver form were solely of a factual nature.  *Valdiviez-Hernandez*, 739 F.3d at 187.

Second, defendant contends that the deportation proceedings improperly deprived him of the opportunity for judicial review because he "did not understand what judicial review was available to him" before he waived his right to judicial review.  He points out that neither the Notice of Intent nor the Waiver sufficiently explained his right to judicial review, and the immigration officer who served him did not explain "the meaning of a 'petition for review' or what habeas corpus relief might be available to him."  ECF 25 at 13.

Third, defendant maintains that, "[e]ven if the Court finds that [he] failed to exhaust his administrative remedies and was not deprived of judicial review, the Court nonetheless should find these two requirements satisfied," because his waiver of these rights was not knowing and intelligent.  ECF 25 at 15.  Specifically, Lopez-Collazo complains that he "was not provided with a written translation of the Notice of Intent or an explanation of the document in his native Spanish" and, therefore, his waiver was invalid.  *Id.* at 14-16.

In its Response, and at oral argument, the Government opposed Lopez-Collazo's first and second arguments, *i.e.*, that he exhausted all remedies available to him and that deficiencies in the Notice of Intent and Waiver, coupled with the immigration officer's failure to explain defendant's right to judicial review, effectively deprived defendant of judicial review.  *See* ECF 24 at 7-12.  According to the Government, defendant could have contested the determination that his prior convictions constituted aggravated felonies under the applicable regulations "by timely filing a request for the evidence against him in response to the [Notice of Intent]."  *Id.* at 8 (citing, *e.g.*, *Lubowa v. U.S. Atty. Gen.*, 315 F. App'x 123, 125 (11th Cir. 2008)).  And, the

Government pointed out that 8 U.S.C. § 1228(b)(3) expressly provides for judicial review of any order issued under 8 U.S.C. § 1228.  Subsection (b)(3) of 8 U.S.C. § 1228 states:  "The Attorney General may not execute any order described in paragraph (1) until 14 calendar days have passed from the date that such order was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 1252 of this title."

The Government also insisted that Lopez-Collazo cannot establish elements one and two because he waived his rights to both.  ECF 24 at 6-7, 10.  However, in its briefings on the Motion to Dismiss, the Government did not respond to Lopez-Collazo's argument that his Waiver was invalid because he was not advised of his rights in Spanish.  *See* Supplemental Response, ECF 36 at 2.  And, at oral argument, the Government essentially conceded this point.

"An alien's waiver of his appellate rights must be 'knowingly and intelligently made.'" *Narine v. Holder*, 559 F.3d 246, 249-50 (4th Cir. 2009) (quoting *In re Rodriguez-Diaz*, 22 I. & N. Dec. 1320, 1322 (B.I.A. 2000) (citing *Mendoza-Lopez*, 481 U.S. at 840)).  A waiver is invalid if it is not knowingly and intelligently made.  *See*, *e.g.*, *Narine*, 559 F.3d at 249-50; *Richardson v. United States*, 558 F.3d 216, 219–20 (3d Cir. 2009) ("An alien validly waives his rights associated with a deportation proceeding only if he does so voluntarily and intelligently.").  And, as the Government conceded at the hearing, it bears the burden to prove that any waiver was knowing and intelligent.  *See United States v. Gomez*, 757 F.3d 885, 893 (9th Cir. 2014) ("[W]e have said unmistakably that 'the government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings.'") (citation and alteration omitted); *United States v. Reyes–Bonilla*, 671 F.3d 1036, 1044 (9th Cir. 2012) ("The government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings, and

it must do so by clear and convincing evidence."); *see also Narine*, 559 F.3d at 249-50; *United States v. Merino-Hernandez*, 46 F. Supp. 3d 602, 607 (D. Md. 2014).   The Government has not met its burden.[15]

*Merino-Hernandez*, 46 F. Supp. 3d 602, is instructive.   There, the Certificate of Service on the defendant's "Notice of Intent to Issue a Final Administrative Removal Order" stated that the serving agent "explained and/or served" the notice to Merino-Hernandez "in the English/Spanish language."   *Id.* at 605.   The defendant "testified that during the meeting with immigration agents in which they reviewed the Notice of Intent, the agents did not translate the [notice] *in toto*, but that a Spanish-speaking agent explained some things to him."   *Id.* (emphasis in original).   However, the defendant also "contend[ed] that the sections that he signed at the immigration agent's direction had not been translated for him."   *Id.* at 608.   And, the defendant asserted that, at the relevant time, "he understood very little English."   *Id.*   Based on that "uncontradicted evidence," Judge Quarles found that the defendant's waiver was not "knowing and voluntary."   *Id.*

In this case, it is uncontested that Lopez-Collazo's native language is Spanish.   Further, it is undisputed, based on the Certificate of Service on the Notice of Intent, that the NOI and the Waiver on its back side were "explained and/or served" in English.   *See* ECF 14-1 at 1.   And, the uncontradicted evidence is patently clear that in 2007 Lopez-Collazo did not read or understand English to an extent sufficient to enable him to comprehend the NOI or the Waiver form, which were written in English, or to make a knowing and informed decision on the basis of forms that

_____

[15]   At oral argument, the Government did not specify whether its burden is by a preponderance or by clear and convincing evidence.   *Id.*   The Ninth Circuit suggests the standard is "clear and convincing evidence."   *See, e.g., Reyes-Bonilla*, 671 F.3d at 1043.   Regardless of the standard, the Government has not met its burden.

he could not read.  This is evidenced by the guilty plea proceedings as to defendant's two prior

State offenses, which reflect his need for a Spanish interpreter.  *See* ECF 24-4 at 5-7; ECF 24-5

at 3.  And, one of those plea colloquies occurred shortly before the immigration proceedings at

issue here.  *See* ECF 24-4 at 5-7.  There is no basis to conclude that, in the interim between the

assault conviction and the removal proceedings, defendant would have gained proficiency in

English.  In addition, as noted, Lopez-Collazo avers in his Affidavit that he spoke "very little"

English in 2007.  ECF 25-5 at 1.  Notably, the Government has provided no evidence to the

contrary.  It did not call Officer Towey, the agent who served Lopez-Collazo with the Notice of

Intent and who witnessed the Waiver, even though, at oral argument, it stated that Officer Towey

is still an ICE employee.  ECF 48 at 25.

The Ninth Circuit has determined that a "waiver of rights cannot be found to have been

considered or intelligent" if the advisement is not provided in a language the alien can

understand.  *Gomez*, 757 F.3d at 893-96; *Reyes-Bonilla*, 671 F.3d at 1044; *see also United States

v. Ramos*, 623 F.3d 672, 681 (9th Cir. 2010) ("Ramos's waiver of appeal and of the due process

rights specified in the Stipulated Removal form was not 'considered or intelligent' because he

did not receive a competent Spanish language translation of his right to appeal when he signed

the form.").  Although this Court was unable to find a Fourth Circuit case that directly addressed

the question, I am persuaded that Lopez-Collazo's waiver cannot be considered knowing and

intelligent because "there is no evidence that [Lopez-Collazo] was first advised of those rights in

a language he could understand."  *Reyes-Bonilla*, 671 F.3d at 1044.

"Courts have generally held that 'the exhaustion requirement [of § 1326(d)(1)] must be

excused where an alien's failure to exhaust results from an invalid waiver of the right to an

administrative appeal.'"   *United States v. Ortiz*, 488 F. App'x 717, 718 (4th Cir. 2012) (per

curiam) (quoting *United States v. Sosa*, 387 F.3d 131, 136 (2d Cir. 2004)) (alteration in *Ortiz*);

*see also Reyes-Bonilla*, 671 F.3d at 1043 ("If Reyes did not validly waive his right of appeal, the

first two requirements under § 1326(d) will be satisfied."); *United States v. Martinez–Rocha*, 337

F.3d 566, 569 (6th Cir. 2003).   And, *Mendoza-Lopez* established that an alien's invalid waiver of

the right to appeal deprives the alien of judicial review.   481 U.S. at 840 ("Because the waivers

of their rights to appeal were not considered or intelligent, respondents were deprived of judicial

review of their deportation proceeding.").

Accordingly, the invalidity of Lopez-Collazo's waiver of his right to administrative

remedies and judicial review excuses his burden to show that he exhausted available remedies

and suffices to show that the deportation proceeding deprived him of judicial review.   *See*

*Mendoza-Lopez*, 481 U.S. at 840; *Ortiz*, 488 F. App'x at 718; *Merino-Hernandez*, 46 F. Supp. 3d

at 608; *see also United States v. Segundo*, 4:10-CR-0397, 2010 WL 4791280, at *2, 5, 9 (S.D.

Tex. Nov. 16, 2010) (excusing defendant from showing administrative exhaustion and finding

defendant was functionally deprived of judicial review where, although defendant was served in

a mix of Spanish and English with forms matching the Notice of Intent and Waiver here, the

waiver provisions were not presented or explained to the defendant in Spanish).

In sum, I agree with Lopez-Collazo that his waiver was invalid, that his invalid waiver

excuses his burden to show that he exhausted available administrative remedies, and that it

suffices to show that the deportation proceedings improperly deprived him of the opportunity for

judicial review.   Therefore, I need not reach defendant's alternative arguments that regulations

applicable to his expedited removal procedure do not provide any available remedies and that

defects in the Notice of Intent and Waiver forms functionally deprived him of judicial review.

## C.  Section 1326(d) Element Three

"In order to establish fundamental unfairness, a defendant must show that (1) his due

process rights were violated by defects in his underlying deportation proceeding, and (2) he

suffered prejudice as a result of the defects." *Wilson*, 316 F.3d at 510; *accord, e.g.*, *United States

v. Cisneros-Garcia*, 159 F. App'x 464, 467 (4th Cir. 2005); *see also Gomez*, 757 F.3d at 892;

*United States v. Gonzalez-Villalobos*, 724 F.3d 1125, 1129-30 (9th Cir. 2013); *United States v.

Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004).

It is this element on which the Government has focused, vigorously insisting that

defendant cannot establish fundamental unfairness because he cannot show either a violation of

his due process rights or prejudice.  To be sure, the matter is a thorny one.

### 1.  Violation of Due Process Rights

Defendant advances three arguments to support his contention that his 2007 removal

proceeding violated his due process rights.

First, Lopez-Collazo argues that ICE incorrectly determined that his pre-removal

convictions were "aggravated felonies" within the meaning of the INA.  *See* ECF 25 at 2-9;

Removal Order, ECF 14-2 (determining that defendant was "deportable as an alien convicted of

an aggravated felony …").  In support of defendant's claim that his prior convictions were not

aggravated felonies under the INA, he relies, *inter alia*, on the Supreme Court's decision in

*Descamps v. United States*, ___ U.S. ___, 133 S. Ct. 2276, 2281 (2013), decided almost six years

after defendant's removal in November 2007.  Further, defendant contends that because his

"prior convictions were not aggravated felonies," he was "not removable." Reply, ECF 25 at 2. In his Supplemental Response, defendant clarified that his due process rights were violated because he was not removable "as charged." ECF 37 at 1 (citing, *e.g.*, *United States v. Aguilera-Rios*, 769 F.3d 626, 638 (9th Cir. 2014)).

Second, Lopez-Collazo contends that his rights were violated when the "immigration official" failed to "advise him that he was eligible for relief from removal, such as voluntary departure." ECF 25 at 2-3 (citing, *e.g.*, *United States v. Garcia-Santana*, 774 F.3d 528, 533 (9th Cir. 2014)). Because, under the INA, aliens who are not lawful permanent residents and who are convicted of aggravated felonies are not eligible for any kind of discretionary relief, *see* 8 U.S.C. § 1228(b)(5),[16] defendant's argument on this point is also premised on his contention that his pre-removal convictions were not aggravated felonies. ECF 25 at 2-9.

Third, during oral argument, defense counsel asserted that defendant's rights were violated when he was deprived of the fundamental procedural due process protections described in *El Shami*, with respect to an "opportunity to be heard at a meaningful time and in a meaningful manner." *El Shami*, 434 F.3d at 664-65 (citations omitted). In particular, defense counsel argued that the notice of the charges against Lopez-Collazo was defective because they

---

[16] Subsection (b)(5) of 8 U.S.C. § 1228 states: "No alien described in this section shall be eligible for any relief from removal that the Attorney General may grant in the Attorney General's discretion." *See also United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014) ("[N]oncitizens convicted of aggravated felonies are removable on that basis, *see* 8 U.S.C. § 1227(a)(2)(A)(iii), and are ineligible for almost all forms of discretionary relief. *See id.* § 1228(b)(5) (barring persons not admitted into the United States, and convicted of aggravated felonies, from "any relief from removal that the Attorney General may grant in the Attorney General's discretion"); *see also id.* § 1158(b)(2)(B)(i) (barring persons convicted of aggravated felonies from applying for asylum); *id.* § 1229b(a)(3) (cancellation of removal); *id.* § 1229c(a)(1) (voluntary departure).").

were not read to him in Spanish; he was deprived of his right to a hearing; and he was deprived of his right to a fair opportunity to be heard because, in effect, he received no opportunity to be heard.

As an initial matter, the Government urges that all of defendant's due process arguments must fail because 1) Lopez-Collazo's two prior State convictions were aggravated felonies under the law that applied at the time, and 2) *Descamps* does not apply "retroactively" on collateral review. ECF 36 at 3-9. At oral argument, the Government agreed that, "under current law," Lopez-Collazo's Maryland conviction for Second-Degree Assault is not a crime of violence under 18 U.S.C. § 16, or an aggravated felony under the INA. But, it maintained that defendant's conviction for Theft Under $500 is an aggravated felony under the INA under current law, although it cited no authority to support its position. The Government further asserts that, even assuming defendant's pre-removal convictions were not aggravated felonies in 2007, defendant's first two due process arguments fail because no due process rights were implicated under the circumstances of this case. ECF 36 at 2-3.

With regard to defendant's first argument, the Government distinguished this case from *Aguilera-Rios*, 769 F.3d at 633, by pointing out, for example, that the alien in *Aguilera-Rios* was a lawful permanent resident, who thus "had the right to be in the United States, … but for the [Immigration Judge's] determination that he was removable … ." *Id.* Therefore, Aguilera-Rios had a liberty interest in his "removability," subject to due process protections. In contrast, defendant is an illegal alien, with no right to be in this country. As to defendant's second contention, the Government argued that aliens have no constitutionally protected interest in

obtaining discretionary relief, such as voluntary departure.[17]   And, by extension, Lopez-Collazo had no protected right to be informed of his eligibility for such relief, according to the Government.  *See* ECF 36 at 3; *Wilson*, 316 F.3d at 510; *United States v. Aguirre-Tello*, 353 F.3d 1199, 1250-51 (10th Cir. 2004) (en banc).[18]

The Government did not respond to defendant's third argument under *El Shami*, which defendant presented at oral argument.  But, at oral argument, the Government repeatedly insisted that defendant's Motion must fail because Lopez-Collazo could not point to any fundamental defect in the deportation proceeding itself, amounting to a travesty of justice that would render its results unreliable.

For the reasons discussed below, I conclude that Lopez-Collazo has established a fundamental defect in the deportation proceeding itself.   In particular, Lopez-Collazo was deprived of his fundamental right to "an opportunity to be heard at a meaningful time and in a meaningful manner."  *El Shami*, 434 F.3d at 664-65 (citations omitted).

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also*, *e.g.*, *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) ("[T]his court has never held … that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' … .  One of these principles is that no

---

[17] "Under [8 U.S.C.] § 1229c, an alien is generally eligible for voluntary departure so long as he has not been convicted of an 'aggravated felony' rendering him deportable. . . ." *Gomez*, 757 F.3d at 899.

[18] The Ninth Circuit has held that an immigration judge "is obligated to inform an alien of his 'apparent eligibility' for forms of relief such as voluntary departure," *United States v. Valdez-Novoa*, 780 F.3d 906, 913 (9th Cir. 2014) (citing 8 C.F.R. § 1240.11(a)(2)), and that an immigration judge's failure to comply with that duty violates an alien's due process rights.  *Id*.

person shall be deprived of his liberty without opportunity, at some time, to be heard … in respect of the matters upon which that liberty depends … ."). In the context of deportation or removal proceedings, "an alien's 'fundamental' right of due process 'is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *El Shami*, 434 F.3d at 664-65 (quoting *United States v. Torres*, 383 F.3d 92, 104 (3d Cir. 2004)); *see also Aguirre-Tello*, 353 F.3d at 1250-51. "'More specifically, … due process requires an alien who faces [removal] be provided (1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard.'" *El Shami*, 434 F.3d at 665 (quoting *Torres*, 383 F.3d at 104) (alterations in *El Shami*).

In *El Shami*, 434 F.3d 659, the defendant appealed his conviction for unlawful reentry of a deported alien under 8 U.S.C. § 1326(a) and (b)(2). He urged the Fourth Circuit to vacate his conviction, claiming he satisfied all three requirements for a collateral attack under 8 U.S.C. § 1326(d). *Id*. at 661. The Court "conclude[d] that the prior deportation order was flawed" and vacated the conviction. *Id*.[19]

El Shami "immigrated to the United States from Egypt in 1980 and became a permanent resident alien in 1984." *Id*. at 661. In 1993, the Immigration and Naturalization Service ("INS") initiated removal proceedings, charging that El Shami "was subject to deportation under the [INA] for being previously convicted of two crimes of moral turpitude: criminal sexual contact and aggravated arson." *Id*. at 661-662. El Shami did not appear at his final deportation show cause hearing, but "the immigration judge proceeded in absentia and ordered him deported to

---

[19] Judge Widener dissented, 434 F.3d at 666-669, but he did not disagree with part of the majority's holding. Judge Widener would have affirmed the judgment on grounds that El Shami could not establish prejudice because the equities did not favor discretionary relief. *Id*. at 666 ("El Shami did not demonstrate unusual or outstanding equities.") (Citation omitted).

Egypt." *Id*. at 662.   When El Shami was later charged with illegal reentry under 8 U.S.C. § 1326(a) & (b)(2), he filed a motion to dismiss the indictment, arguing that "defects in his 1993 deportation proceedings rendered" his prior order invalid under § 1326(d).   *Id*. at 661-62.   At a hearing on El Shami's motion to dismiss, El Shami testified that he never received notice of the final hearing date.   *Id.* at 662.   Moreover, the Government produced no evidence that it had provided El Shami or his attorney with "written notice of the date and time of the hearing."   *Id*. Thus, El Shami contended that he was denied the opportunity to challenge the factual or legal basis for deportation; deprived of the opportunity to apply for relief from deportation under Section 212(c) of the INA Act. 8 U.S.C. § 1182(c); and denied his right to administrative and judicial review.   *Id.* at 663.   The district court denied the motion to dismiss.

The failure to provide the required notice satisfied the first two elements for a collateral attack under 8 U.S.C. § 1326(d), according to the Court.   *Id.* at 664.   The Fourth Circuit also determined that the failure of the INS "to send El Shami written notice of his deportation hearing deprived him of due process."   *Id.*   It reasoned: "Although El Shami was aware of the charges against him, the INS's failure to provide notice … deprived him of the opportunity to contest those charges or otherwise seek relief from deportation from the administrative tribunal."   *Id*. at 665.   Notably, nothing in the opinion of the Court indicates that its decision turned on the fact that El Shami was a lawful permanent resident, or that its rationale is limited only to lawful permanent residents.

Here, as discussed, while Lopez-Collazo was in custody, he was served with the Notice of Intent by ICE Officer Towey and signed the Waiver on the same day.   *See* ECF 14-1; ECF 25-5 at 2; ECF 48 at 54, 59.   There is abundant evidence that, at the time, Lopez-Collazo required

translation assistance in order to understand the NOI, the Waiver, and legal proceedings conducted in English.  *See* Plea Colloquy & Sentencing, ECF 24-4 at 5-7; ECF 24-5 at 3.  Yet, the Notice of Intent itself shows that Officer Towey "explained and/or served" it to Lopez-Collazo in English, ECF 14-1, and there is no evidence that any part of the Notice of Intent or the Waiver was translated into Spanish or explained to Lopez-Collazo in Spanish.  Nor is there evidence that Officer Towey was capable of speaking Spanish at a level sufficient to ensure Lopez-Collazo could make a considered and intelligent decision about whether to challenge removal, waive his rights, or to seek the assistance of an attorney.

"Courts have recognized the importance of a competent translator to ensure the fairness of proceedings to applicants who do not speak English."  *Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir. 1996); *see also Perez-Lastor v. I.N.S.*, 208 F.3d 773, 778 (9th Cir. 2000) ("It is long-settled that a competent translation is fundamental to a full and fair hearing."); *Nazarova v. I.N.S.*, 171 F.3d 478, 484 (7th Cir. 1999) ("A non-English-speaking alien has a due process right to an interpreter at her deportation hearing because, absent an interpreter, a non-English speaker's ability to participate in the hearing and her due process right to a meaningful opportunity to be heard are essentially meaningless.");[20] *Augustin v. Sava*, 735 F.2d 32, 37 (2d

---

[20] In *Nazarova*, 171 F.3d 478, the Seventh Circuit also said, in regard to notice of a hearing, as follows, *id.* at 483:

> It has long been established that due process allows notice of a hearing (and its attendant procedures and consequences) to be given solely in English to a non-English speaker if the notice would put a reasonable recipient on notice that further inquiry is required.  *See, e.g., Toure v. United States*, 24 F.3d 444, 446 (2d Cir. 1994) (approving inquiry notice in criminal forfeiture context); *Soberal–Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983) (noting, in a social security benefits case, that "[a] rule placing the burden of diligence and further inquiry on the part of a non-English-speaking individual served in this country with a notice

Cir. 1984) ("A hearing is of no value when the alien and the judge are not understood. … The very essence of due process is a 'meaningful opportunity to be heard.'"); *see also Tejeda–Mata v. I.N.S*, 626 F.2d 721, 726 (9th Cir. 1980), *cert. denied*, 456 U.S. 994 (1982).

In light of defendant's language barrier, there is no basis to conclude that he understood the charges against him or his rights.  Moreover, even if service of the NOI in English provoked reasonable inquiry, there is no basis to conclude that Lopez-Collazo had time to consult with anyone in his native language about its contents before he waived his rights to contest it.  To the contrary, the facts indisputably show that, to the extent Lopez-Collazo had any opportunity to be heard, the proceedings were conducted in a language he did not speak, and ended with him making an uncounseled, unknowing waiver of his ability to challenge the charges against him, either via available administrative remedies or upon petition for judicial review.

Under the standard articulated in *El Shami*, Lopez-Collazo was deprived of his fundamental right to an "opportunity to be heard at a meaningful time and in a meaningful manner."  *El Shami*, 434 F.3d at 664-65 (citations omitted).  *See also Segundo*, *supra*, 2010 WL 4791280, at *6-9 (finding that prior expedited removal proceeding of defendant charged under § 1326 "could not have comported with due process when he was not apprised of his right to

---

in English does not violate any principle of due process"); *Carmona v. Sheffield*, 475 F.2d 738, 739 (9th Cir. 1973) (finding that due process does not require California to translate its notice of rights under the unemployment laws for non-English speakers). We see no reason why such inquiry notice should not be sufficient in the deportation context as well.

In this case, however, the issue does not concern notice of a hearing.  And, although the *Nazarova* Court determined that the alien had received adequate notice of the date and time of her hearing, it ultimately concluded that she "did not receive a meaningful opportunity to be heard" because she had no interpreter at her first hearing.  *Id*. at 484.

[obtain] counsel, his waiver of rights to counsel and appeal were obtained unknowingly, and the removal proceeding took place in a language he did not understand"); *United States v. Higareda-Ramirez*, 107 F. Supp. 2d 1248, 1256 (D. Haw. 2000) (granting motion to dismiss indictment for illegal reentry) ("One need not have an exceptional imagination to conceive of the horrors that might be perpetrated if aliens could be convicted based on deportation orders procured in unrecorded and thus fully insulated proceedings conducted in a language unintelligible to the unrepresented aliens.").

Accordingly, Lopez-Collazo has established that "his due process rights were violated by defects in his underlying deportation proceeding." *Wilson*, 316 F.3d t 510.  Because I find for defendant on this ground, I need not reach the parties' remaining arguments with regard to defendant's due process rights.

## 2. Prejudice

Under the fundamental fairness prong of a collateral attack on a prior removal order, a defendant must establish that "the deficiencies in the deportation proceedings caused him actual prejudice." *El Shami*, 434 F.3d at 665 (citing *Wilson*, 316 F.3d at 509).  In order to show actual prejudice, the defendant "must show that, but for the errors complained of, there was a reasonable probability that he would not have been deported." *El Shami*, 434 F.3d at 665 (citing *Wilson*, 316 F.3d at 511); *see also Cisneros-Garcia*, *supra*, 159 F. App'x at 467 ("A showing of prejudice requires a defendant to prove a reasonable likelihood that, but for the errors complained of, he would not have been deported.") (citing *Wilson*, 316 F.3d at 510).[21]  The

---

[21] Defendant also argued that the prejudice standard of "plausibility" as established by the Ninth Circuit should be applied to his voluntary departure argument.  Similarly, the Government seemed to accept that the "plausibility" standard applies, at least to defendant's second due

Tenth Circuit, sitting en banc, recently determined that the "reasonable probability" standard adopted by most circuits, including the Fourth Circuit, requires a showing lesser than a standard that requires aliens to show that "the outcome of his case would have been different." *Aguirre-Tello*, 353 F.3d at 1207-08.

Defendant offers two arguments in support of his claim of prejudice. First, he argues that his removal when he was not removable "as charged" constitutes prejudice. ECF 25 at 9 ("He suffered prejudice in the first instance because he was removed when he should not have been.") (citing, *e.g.*, "*United States v. Camacho-Lopez*, 450 F.3d 928, 930 (9th Cir. 2006 (holding that removal of alien when he should not have been was clearly prejudice)"). Second, defendant argues he "was further prejudiced because there was a reasonable probability that, but for the errors in the removal proceeding, he would have received voluntary departure." ECF 25 at 10 (citing, *e.g.*, *Wilson*, 316 F.3d at 510, and *United States v. Garcia-Santana*, 774 F.3d 528, 533 n.1 (9th Cir. 2014)). As with some of defendant's due process arguments, described *supra*, both of defendant's prejudice arguments rely on his contention that his two prior convictions were erroneously classified as aggravated felonies.

In response, the Government advances three arguments. First, at oral argument the Government reiterated its belief that Lopez-Collazo suffered no prejudice because his pre-removal convictions were aggravated felonies *at the time of his removal*. Thus, he was removable as charged and was not eligible for voluntary departure. Second, the Government argues that, even if defendant was not removable "as charged," it is undisputed that he was still

process argument. ECF 36 at 10. But, this Court is bound by established Fourth Circuit precedent. *See El Shami*, 434 F.3d at 665. In any event, defendant also argued that he has established prejudice under a "reasonable probability" standard. ECF 37 at 8, 13.

"removable," because he was never lawfully present in the United States.   ECF 36 at 10.

Therefore, it posits that Lopez-Collazo "eventually would have been removed anyway,

irrespective of whether he was classified as an 'aggravated felon' or not."   *Id*.   Third, the

Government argues that, even if Lopez-Collazo were eligible for voluntary departure, it was not

"plausible" that an immigration judge would have exercised discretion in the alien's favor.   ECF

36 at 10 (citing *United States v. Valdez-Novoa*, 780 F.3d 906, 917 (9th Cir. 2014)).

Under Supreme Court and Fourth Circuit precedents from 2013 and 2014, it is clear that

*today* Lopez-Collazo would not be removable "as charged" in the Notice of Intent, because his

two prior Maryland offenses are not aggravated felonies.   Further, under these same precedents,

Lopez-Collazo was not removable "as charged" in 2007.   Moreover, although Lopez-Collazo

would have remained removable on other grounds, I am satisfied that there is a reasonable

probability that an immigration judge would have granted a request for voluntary departure, in

lieu of deportation.   I will elaborate on each of these points, in turn.

### a.  Status of Defendant's Pre-Removal Convictions Under "Current" Law

It is clear that neither of defendant's pre-removal Maryland convictions now constitute

aggravated felonies under the INA.

To determine "whether a state law conviction qualifies as an aggravated felony for

removal purposes," courts "use the categorical approach set forth [in 1990] in *Taylor v. United

States*, 495 U.S. 575 (1990), and recently clarified in *Descamps*, [133 S. Ct. at 2285]."

*Omargharib v. Holder*, 775 F.3d 192, 196 (4th Cir. 2014); *see United States v. Aparicio-Soria*,

740 F.3d 152, 160 (4th Cir. 2014) (en banc); *Karimi v. Holder*, 715 F.3d 561, 568 (4th Cir. 2013)

(discussing use of *Taylor* categorical approach in context of determining whether Maryland

second-degree assault conviction constituted aggravated felony under the INA), *cert. denied*,

_____ U.S. _____, 134 S. Ct. 1777 (2014).   In *Descamps*, the Supreme Court held that at

sentencing the categorical approach applies to state crimes with a "single, indivisible set of

elements." 133 S. Ct. at 2282.

When using the categorical approach, a court may "look only to the fact of conviction

and the statutory definition of the prior offense." *Taylor*, 495 U.S. at 602; *see Descamps*, 133 S.

Ct. at 2281-82.   In applying the categorical approach, courts must "consider the offense

generically, that is to say, … how the law defines the offense and not … how an individual

offender might have committed it on a particular occasion." *Begay v. United States*, 553 U.S.

137, 141 (2008); *see also*, *e.g.*, *James v. United States*, 550 U.S. 192, 202 (2007).   In other

words, a court may not look to the facts of the particular case, "but instead to whether 'the State

statute defining the crime of conviction' categorically fits within the 'generic' federal definition

of a corresponding aggravated felony." *Moncrieffe v. Holder*, _____ U.S. _____, 133 S. Ct. 1678,

1684 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 186 (2007)).

The categorical approach involves a two-step process.   The Fourth Circuit explained in

*United States v. Peterson*, 629 F.3d 432 (4th Cir. 2011), stating:   "First, a court must distill a

'generic' definition of the predicate offense based on how the offense is defined 'in the criminal

codes of most states.'"   *Id.* at 436 (quoting *Taylor*, 495 U.S. at 598).   "Second, after finding the

generic form of the predicate offense, a court must determine whether the defendant's prior

conviction constituted a conviction of the generic offense." *Peterson*, 629 F.3d at 436.   The

"determination is made categorically, not by comparing the defendant's prior *conduct* with the

generic offense, but rather by comparing the *elements* of the crime of conviction with the generic

offense." *Id.* (emphasis in original). *See also United States v. Flores-Granados*, ____ F.3d ____, 2015 WL1652524 at *2-3 (filed Apr. 15, 2015); *United States v. Vann*, 660 F.3d 771 (4th Cir. 2011); *United States v. Clay*, 627 F.3d 959, 966 (4th Cir. 2010).

Courts also sometimes employ an alternate approach, known as the "modified categorical approach." "Under this approach, courts may look beyond the statutory text and consult a limited set of documents in the record … to determine which crime the defendant was convicted of committing." *Omargharib*, 775 F.3d at 198.

The modified categorical approach derives from language set out in *Taylor*, 495 U.S. at 602, in which the Supreme Court considered the applicability of the sentencing enhancement under the Armed Career Criminal Act ("ACCA") to the defendant, a felon convicted of unlawful possession of a firearm. The Court said, *id.*:

> We think the only plausible interpretation of § 924(e)(2)(B)(ii) is that, like the rest of the enhancement statute, it generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense.[ ] This categorical approach, however, may permit the sentencing court to go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of generic burglary. For example, in a State whose burglary statutes include entry of an automobile as well as a building, if the indictment or information and jury instructions show that the defendant was charged only with a burglary of a building, and that the jury necessarily had to find an entry of a building to convict, then the Government should be allowed to use the conviction for enhancement.

To illustrate, in *Johnson v. United States*, 559 U.S. 133 (2010), the Supreme Court considered whether the Florida felony offense of battery constituted a "violent felony" so as to serve as a proper predicate offense under the ACCA, 18 U.S.C. § 924(e)(1). In its analysis, the Court stated that use of the modified categorical approach is appropriate only if the offense in

issue includes "several different generic crimes, some of which require violent force and some of which do not. . . ." *Id.* at 144.

In its 2013 decision in *Descamps*, 133 S. Ct. at 2283, the Supreme Court clarified that the modified categorical approach can only be used if the statute under which an individual was convicted is "divisible," *i.e.*, where the statute "include[s] multiple alternative *elements* (thus creating multiple versions of a crime), as opposed to multiple alternative *means* (of committing the same crime)." *Omargharib*, 775 F.3d at 198. "Elements, as distinguished from means, are factual circumstances of the offense the jury must find unanimously and beyond a reasonable doubt." *Id.* at 188 (citations omitted). If a statute is *not* divisible, then courts cannot apply the modified categorical approach to determine the facts underlying an individual's particular conviction. *Descamps*, 133 S.Ct. at 2283; *see also Flores-Granados*, 2015 WL 1652524 at *3.

If the modified categorical approach applies, then, under *Shepard v. United States*, 544 U.S. 13, 21 (2005), the sentencing court may look to certain "conclusive records made or used in adjudicating guilt" to determine which variety of an offense the defendant committed, such as the violent or non-violent variety. The so-called *Shepard* documents, to which a sentencing court may refer under the modified categorical approach, include "charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms," *Johnson*, 559 U.S. at 144, and "any explicit factual finding by the trial judge to which the defendant assented" in a guilty plea. *Shepard*, 544 U.S. at 16. The court may consider facts "inherent in the conviction [ ]or admitted by the defendant," *United States v. Alston*, 611 F.3d 219, 226 (4th Cir. 2010), and facts contained in police reports that are incorporated by reference in the charging document, but not facts contained in

unincorporated police reports or applications for statements of charges.  *Shepard*, 544 U.S. at 21-22; *see also United States v. Donnell*, 661 F.3d 890, 894 (4th Cir. 2011).

As indicated, the use of the categorical and modified categorical approaches of *Taylor*, 495 U.S. 575, and *Shepard*, 544 U.S. 13, apply to determine whether an offense constitutes an aggravated felony.  *See*, *e.g.*, *Garcia-Santana*, 774 F.3d at 533.  The parties do not dispute that in 2007 the Fourth Circuit applied the modified categorical approach when called upon to analyze Maryland's crime of second-degree assault.  Indeed, the line of cases to this effect is quite substantial.  *See*, *e.g.*, *United States v. Alston*, 611 F.3d 219 (4th Cir. 2010); *United States v. White*, 606 F.3d 144 (4th Cir. 2010); *United States v. Harcum*, 587 F.3d 219 (4th Cir. 2009); *United States v. Simms*, 441 F.3d 313 (4th Cir. 2006); *United States v. Coleman*, 158 F.3d 199 (4th Cir. 1998); *United States v. Kirksey*, 138 F.3d 120 (4th Cir. 1998); *see also United States v. Barillas*, 492 F. App'x 416, 417 (4th Cir. 2012) (per curiam) (rejecting the defendant's argument that "the district court erroneously employed the modified categorical approach in determining that his Maryland second-degree assault conviction qualified as a crime of violence"); *United States v. Baranda-Cuevas*, 418 F. App'x 177, 179 (4th Cir. 2011) (stating that the "district court did not err in using the modified categorical approach" to determine whether a Maryland second-degree assault conviction qualified as a crime of violence for purposes of sentencing enhancement).

Nevertheless, the Government concedes (within the context of this case only), that Maryland's second-degree assault offense, C.L. § 3-203, is not categorically a "crime of violence" under 18 U.S.C. § 16, and not divisible within the meaning of *Taylor*, 495 U.S. at 600, and *Descamps*, 133 S. Ct. at 2283.  This was made clear in *United States v. Royal*, 731 F.3d 333,

341 (4th Cir. 2013), *cert. denied*, ____ U.S. ____, 134 S. Ct. 1777 (2014).  There, the Fourth

Circuit concluded that C.L. § 3-203 is not divisible under *Descamps*, and that Maryland's

offense of second-degree assault is categorically not a crime of violence.  *Id*.  Therefore, the

Court determined that the district court erred in using the modified categorical approach to

determine whether the defendant's prior second-degree assault conviction constituted a violent

felony under ACCA.  *Id.*; *see also United States v. Gomez*, 690 F.3d 194, 200 (4th Cir. 2012)

(concluding that "the modified categorical approach applies only to those statutory offenses in

which the statute itself is divisible"); *United States v. Bailey*, 487 F. App'x 823, 823 (4th Cir.

2012) (per curiam) (vacating sentence and remanding for reconsideration as to whether modified

categorical approach applied to a Maryland second-degree assault conviction).

Therefore, under current law, it is clear that defendant's Second-Degree Assault

conviction is not an aggravated felony within the meaning of the INA.  *See* 8 U.S.C.

§ 1101(a)(43)(F) (defining crimes of violence under 18 U.S.C. § 16 to be aggravated felonies).

Defendant also argues that, with respect to his conviction for Theft Under $500, it is not

an aggravated felony under *Taylor* and *Descamps* because it is broader than the federal definition

of "theft", incorporated in the INA's definition of theft as an aggravated felony at 8 U.S.C.

§ 1101(a)(43)(G).  *See* ECF 25 at 5-9.  Further, he asserts that the offense is not divisible,

because a Maryland "jury does not have to unanimously agree on which of the subsections has

been proven as long as the jurors agree that theft in some form was committed." ECF 25 at 7.

The Government counters that defendant's theft conviction is an aggravated felony

within the meaning of § 1101(a)(43)(G).  *E.g.*, ECF 24 at 13-14.  But, it has never provided

authority to dispute defendant's argument on this point.

I agree with defendant that, at least under current law, defendant's theft conviction is not an aggravated felony under the INA.  When, as here, a State statute of conviction "sweeps more broadly than the generic crime, a conviction under the law cannot count as an [aggravated felony], even if the defendant actually committed the offense in its generic form." *Descamps*, 133 S. Ct. at 2283.  The recent case of *State v. Manion*, for example, ____ Md. ____, No. 48 (Sept. 2014 Term) (filed April 1, 2015) illustrates the multiple means by which the offense of theft may be committed in Maryland under C.L. § 7-104.  *See Rice v. State*, 311 Md. 116, 125-26, 532 A.2d 1357, 1361 (1987) (stating that Maryland consolidated theft statute creates single crime of theft that enumerates alternative methods by which the crime can be committed, and thus juror unanimity is not required as to means); *see also Omargharib*, 775 F.3d at 197 ("Like the BIA, we conclude that the Virginia crime of larceny does not categorically match the INA's theft offense crime because Virginia larceny punishes a broader range of conduct than that federal offense.  Specifically, Virginia law defines larceny to include both fraud and theft crimes."); *State v. Burroughs*, 333 Md. 614, 636 A.2d 1009 (Md. 1992) (upholding theft conviction under C.L. § 7-104 where defendant had obtained, through fraud, consent of victims); *In Re: Clayton Hugh Anthony Stewart*, A 043 399 408 (BIA Feb. 11, 2015) (filed at ECF 25-2) (holding convictions under C.L. § 7-104 do not constitute aggravated felonies because the Maryland theft statute is broader than the federal "theft" offense and not divisible).

### b.  Status of Defendant's Pre-Removal Convictions in 2007

In general, when a defendant lodges a collateral attack on a removal order, challenging an alleged aggravated felony that served as the basis for removal, the reviewing court is entitled to consider whether the prior conviction actually constituted an aggravated felony at the relevant

time.  *See*, *e.g.*, *Garcia-Santana*, 774 F.3d at 533-43; *Aguilera-Rios*, 769 F.3d at 626; *Camacho-Lopez*, 450 F.3d at 928.[22]  For essentially the same reasons just discussed, Lopez-Collazo's assault and theft convictions were not aggravated felonies under the INA at the time of his removal in 2007.

The Government insists that it would be error for this Court to apply "retroactively" the holding of *Descamps* in considering the fundamental fairness of defendant's collateral attack on his removal order.  In its Response, the Government argued that post-2007 precedent "cannot be used to undercut a determination that was made in 2007, at a time when the modified categorical approach was sanctioned by the Fourth Circuit for use in determining whether a second degree assault constituted a violent felony or crime of violence."  ECF 24 at 13.

In its Supplemental Response, the Government focused its arguments on defendant's contention that Officer Towey's failure to inform him of his eligibility for discretionary relief violated due process.  ECF 36 at 2.  In that context, the Government argued:  "[T]he retroactivity (or non-retroactivity) of *Descamps* … is not the appropriate inquiry.  Rather, the critical question is whether the defendant was '*apparently* eligible' for discretionary relief *in 2007*, at the time immigration officials acted (and allegedly deprived Lopez-Collazo of due process).  8 C.F.R. § 1240.11(a)(2)."  *Id.* at 7.[23]

---

[22] The Government agreed at the motions hearing that it would be proper, on collateral review under § 1326(d), for courts to "invalidate" removal orders where, for example, the immigration official conducting the removal proceeding "made a mistake" under the law as it existed at the time.

[23] This line of argument was addressed to only one of defendant's due process claims that I have not reached.  And, because, as discussed in the Ninth Circuit cases cited by the Government in its Supplemental Response, ECF 37 at 4-9, the Ninth Circuit's determinations

At the motions hearing on April 30, 2015, the Government argued that *Descamps* cannot be applied "retroactively" because the question arises on collateral review, rather than direct review. In support of its position, the Government relied on the Fourth Circuit's recent opinion in *United States v. Foote*, ___ F.3d ___, 2015 WL 1883538, at *1 (4th Cir. Apr. 27, 2015), and its opinion in *United States v. Baker*, 719 F.3d 313, 321 (4th Cir. 2013). Both of those decisions involved collateral attacks on criminal sentences and convictions (respectively) brought under 28 U.S.C. § 2255. Relying on this analogy to § 2255 petitions, the Government urges that a challenge under 8 U.S.C. § 1326(d) must be considered under the law *and precedents* governing at the time of the movant's deportation proceeding.

I agree with the Government that fundamental fairness should be assessed under the law governing an alien's removal at the time of the removal proceeding. *See*, *e.g.*, *United States v. Suazo-Martinez*, DKC-2000-0371, 2000 WL 1876591, at *2-4 (D. Md. Dec. 20, 2000) (assessing whether defendant charged under § 1326 would have been eligible for discretionary relief under the provisions of the INA in effect at the time of his deportation); *see Gomez*, 757 F.3d at 900 (analyzing whether alien's prior state offense categorically qualified as an aggravated felony at the time he was deported). But, I do not agree that this assessment should proceed under the *erroneous* application of law as it existed at the time, even where, as happened here, courts repeatedly made the same error. In other words, I do not agree that it would be error to apply *Descamps* "retroactively," because *Descamps* merely clarified existing law.

---

were tethered to the language in a particular immigration regulation no longer relevant in this case, I will not further discuss this line of argument.

To be clear, there has been no *change* in the applicable law in terms of the proper analysis to determine whether defendant's prior State offenses were aggravated felonies. *Taylor*, *Shepard*, and their progeny are the precedent today, and *Taylor* and *Shepard* were the governing precedents in 2007. *Descamps* did not articulate new law.

"*Descamps* is a statutory interpretation case:  It clarifies when certain crimes qualify as violent felonies under the ACCA, a congressional enactment." *Ezell v. United States*, 778 F.3d 762, 766 (9th Cir. 2015).  As the Ninth Circuit said in *Aguilera-Rios*, 769 F.3d at 631, quoting the Tenth Circuit in *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1107 (10th Cir. 2005), "'[d]ecisions of statutory interpretation are fully retroactive because they do not change the law, but rather explain what the law has always meant.'"  *See also United States v. Davis*, 751 F.3d 769, 775 (6th Cir. 2014) ("The Supreme Court in *Descamps* explained that it was not announcing a new rule, but was simply reaffirming the *Taylor/Shepard* approach, which some courts had misconstrued.").

Thus, in *Aguilera-Rios*, 769 F.3d at 631, for example, the Ninth Circuit expressly rejected the Government's claim that the Supreme Court's 2013 decision in *Moncrieffe v. Holder*, *supra*, 133 S. Ct. 1678, could not "be retroactively applied to invalidate [the defendant's] 2005 removal order."  Similarly, in *United States v. Lopez-Ortiz*, 313 F.3d 225 (5th Cir. 2002), the Fifth Circuit rejected the retroactivity argument advanced by the Government in that case.  The Fifth Circuit said, *id.* at 230:

> The government argues that [*I.N.S. v.*] *St. Cyr*[, 533 U.S. 289 (2001)] should not affect our evaluation of Lopez-Ortiz's [1998] removal hearing because the Supreme Court has held that new rules of civil law do not apply retroactively to cases not on direct review. *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 113 (1993).  The government's error is in its view of *St. Cyr* as announcing a new rule. *St. Cyr* was a case of statutory interpretation.  As such, its holding did not

> change the law. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994). Rather, *St. Cyr* "finally decided what [the relevant statute] had *always* meant and explained why the [BIA and the] Courts of Appeals had misinterpreted the will of the enacting Congress." 511 U.S. at 313 n.12 (emphasis in original). Therefore, *St. Cyr* established Lopez-Ortiz's eligibility for § 212(c) relief at the time of his removal, and the Immigration Judge's contrary understanding, although in compliance with BIA precedent, was an erroneous application of the law. This error informs our evaluation of the fundamental fairness of the removal hearing. (Some citations omitted).

*See also United States v. Leon-Paz*, 340 F.3d 1003, 1006-07 (9th Cir. 2003) (vacating district court's denial of motion to dismiss indictment under § 1326(d) on finding that immigration judge erred in determination that defendant was not eligible for discretionary relief where post-removal Supreme Court precedent clarified that certain statutory changes did not apply to defendant).

Notably, the effect of a successful collateral attack under § 1326(d) is strictly *pro*spective. Unlike successful petitions for post-conviction relief, a successful attack under § 1326 does not vacate the underlying removal order. *Mendoza-Lopez*, 481 U.S. at 839; *see, e.g.*, *Aguilera-Rios*, 769 F.3d at 633 ("We note that a determination by this Court on collateral review that a noncitizen's conviction was not for a federal aggravated felony offense would not affect the finality of the prior removal. *See* 8 C.F.R. § 1003.23(b)(1)."). The collateral attack here, if successful, would merely prohibit the Government from relying on a *particular* removal order to prove its illegal reentry case under § 1326(a)—nothing more and nothing less. Indeed, a successful collateral attack would not necessarily enable the alien to escape conviction under § 1326(a) & (b), because to sustain its burden of proof the Government may of course rely on any other prior, valid order entered against the alien. *See, e.g.*, *United States v. Acosta-Flores*, 484 F. App'x 747, 749-50 (4th Cir. 2012) (per curiam) (affirming denial of motion to dismiss

indictment charging illegal reentry where removal order entered *in absentia* in 1996 appeared to be invalid but subsequent removal order entered in 2002 on other grounds was valid).

As indicated by the Supreme Court in *Mendoza-Lopez*, 481 U.S. at 837, where, as here, an alien has been deprived of judicial review of his removal order, due process requires that the collateral attack procedure be available to a defendant charged with criminal reentry precisely *because* that alien is *currently* under prosecution.  Otherwise, § 1326 itself would "not comport with the constitutional requirement of due process."  *See Wilson*, 316 F.3d at 515 (Motz, J., concurring) ("[A]s the Court recognized in *Mendoza-Lopez*, a defendant facing criminal prosecution under § 1326 does have a liberty interest at stake— the liberty interest in not being imprisoned on the basis of a fundamentally unfair deportation proceeding that has never been subjected to judicial review."); *see also Aguilera-Rios*, 769 F.3d at 633 ("To maintain via enforcement proceedings the finality of an otherwise proper removal order is one thing; to impose criminal sanctions under these circumstances is quite another.").  Thus, I do not agree that to consider the effect of *Descamps* on the validity of defendant's removal order, for the narrow purpose of determining whether the Government can show *today* that the defendant is guilty of illegal reentry, is to apply *Descamps* "retroactively."

For essentially the same reason, the Government's analogy to post-conviction § 2255 petitions is unavailing.  A collateral attack under § 1326(d) does not disturb the underlying removal order.  Therefore, it does not threaten society's fundamental interest in the finality of judgments to the same degree as a post-conviction § 2255 challenge.  *See Mackey v. United States*, 401 U.S. 667, 682-83 (1971) (Harlan, J., concurring) ("The interest in leaving concluded litigation in a state of repose, that is, reducing the controversy to a final judgment not subject to

further judicial revision, may quite legitimately be found by those responsible for defining the scope of the writ [of habeas corpus] to outweigh in some, many, or most instances the competing interest in readjudicating convictions according to all legal standards in effect when a habeas petition is filed."); *Teague v. Lane*, 489 U.S. 288, 306 (1989) ("[I]t is 'sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [habeas] cases on the basis of intervening changes in constitutional interpretation.'") (quoting *Mackey*, 401 U.S. at 689 (Harlan, J., concurring)) (alteration in *Teague*).   Therefore, applying post-removal-proceeding precedent to determine whether a prior entry of a removal order was fundamentally unfair in the context of a current prosecution does not threaten the same sort of endless litigation and uncertainty reflected in the decisions interpreting the scope of relief under § 2255.

Additionally, limitations on the scope of relief under § 2255 are often justified on grounds that the judgments challenged have already been "perfected" by appeal, and, therefore, society is *entitled* to presume their validity and afford them finality.   *Cf. United States v. Frady*, 456 U.S. 152, 164 (1982) ("Because it was intended for use on direct appeal, however, the 'plain error' standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal.").   Attacks under § 1326(d), in contrast, challenge the validity of administrative orders and are only possible where a movant can show that he or she was improperly deprived of judicial review.   As explained in *Mendoza-Lopez*, 481 U.S. at 837-38 (emphasis in original), aliens are only permitted to bring collateral attacks on prior orders when charged with illegal

reentry because due process requires they be afforded "*some* meaningful review" of the administrative order where the order "is to play a critical role in the subsequent imposition of a criminal sanction." Thus, unlike judgments that may be challenged under § 2255, removal orders that may be challenged under § 1326(d) *necessarily* have not been perfected by judicial appeal and are not entitled to the same presumption of validity or finality and repose.

Accordingly, I conclude that in 2007, at the time of defendant's removal proceeding, Lopez-Collazo's pre-removal Maryland convictions for Second-Degree Assault and Theft Under $500 were not aggravated felonies under the INA.

### c. Likelihood of Defendant's Deportation

Because Lopez-Collazo's pre-removal convictions are not now and were not, in 2007, aggravated felonies under the INA, and because the Removal Order was premised on ICE's erroneous legal determination that defendant was "deportable as an alien convicted of an aggravated felony," *see* ECF 14-2 at 1, it is clear that defendant was not removable "as charged." According to defendant, it is equally clear that, if he had been given a fair opportunity to be heard, there is a reasonable probability that he would not have been deported, and would have obtained voluntary departure. Defendant contends that this is sufficient to establish prejudice under § 1326(d).

The Government counters that, even if the Court finds Lopez-Collazo was not removable "as charged," the Court should not find that this amounts to the sort of prejudice required under § 1326(d). In short, the Government argues that, even if defendant's due process rights were violated, and even if he was not removable as charged, under the circumstances, defendant cannot show that the entry of the Removal Order was fundamentally unfair because defendant

"eventually would have been removed anyway, irrespective of whether he was classified as an 'aggravated felon' or not." ECF 36 at 10.

Defendant has never disputed that he would have had to leave the United States even if he had successfully disputed the charges lodged in the Notice of Intent. He has never argued that, but for the fundamental defects in his 2007 deportation proceeding, there is a reasonable probability he could have obtained legal status in the United States. In this way, he is unlike the movants in *Mendoza-Lopez*, *El Shami*, *Camacho*, and *Aguilera-Rios*. Rather, defendant contends that, but for the fundamental defects in his 2007 deportation proceeding, there is a reasonable probability that he would never have had an order of deportation entered against him, because he would have been granted voluntary departure.[24] And, if defendant obtained voluntary departure, he would not face the serious criminal charges now pending against him.

The Government does not dispute Lopez-Collazo's assertion that, if ICE had not classified his pre-removal convictions as aggravated felonies, he would have been eligible for pre-order voluntary departure.[25] Rather, the Government argues that defendant cannot show prejudice because it is not even "plausible" that an immigration judge would have exercised her discretion in Lopez-Collazo's favor. ECF 36 at 10.

Pursuant to 8 C.F.R. § 1240.26(b)(1)(i), in order to be eligible for pre-order voluntary departure, an alien must:

---

[24] Lopez-Collazo has not argued in briefing to the Court, or stated in his Affidavit, that he, in fact, *would* have sought pre-order voluntary departure. But, the assertion is implicit in his contention. And, the Government has not argued that defendant failed to make this claim.

[25] At the motions hearing on April 30, 2015, the Government argued that defendant would not have been eligible for *post*-order voluntary departure. But, defendant reiterated that he never claimed he would have been eligible for that relief.

(A) Make[ ] such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;

(B) Make[ ] no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concede[ ] removability;

(D) Waive[ ] appeal of all issues; and

(E) Ha[ve] not been convicted of [an aggravated felony] and .. not [be] deportable under section 237(a)(4) [relating to national security].

It is well established that a grant of voluntary departure depends upon a balancing of positive and negative equities as to the alien requesting relief. *See Valdez-Novoa*, 780 F.3d at 917; *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1264 (9th Cir), *cert. denied*, _____ U.S. _____, 134 S. Ct. 805 (2013). In *Matter of Arguellos-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999), which is cited by courts addressing this issue, the Board of Immigration Appeals ("BIA") described the applicable standard as follows:

> The Board ruled in *Matter of Gamboa*, 14 I. & N. Dec. 244 (BIA 1972), that many factors may be weighed in exercising discretion with voluntary departure applications, including the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident. We further stated that discretion may be favorably exercised in the face of adverse factors where there are compensating elements such as long residence here, close family ties in the United States, or humanitarian needs. *Id*. at 248; *see also Campos-Granillo v. I.N.S.*, 12 F.3d 849 (9th Cir. 1994) (holding that in exercising discretion as to whether to grant or deny voluntary departure requests, the Immigration Judge must weigh both favorable and unfavorable factors by evaluating all of them); *Matter of Thomas*, Interim Decision 3245 (BIA 1995).

To be sure, the Fourth Circuit has also described the grant of voluntary departure as "highly discretionary." *United States v. Shomade*, 125 F.3d 850, at *2 (4th Cir. 1997) (unpub.

table decision).   In *Matter of Arguellos-Campos*, 22 I. & N. Dec. at 819-20, the BIA similarly

stated:  "Congress contemplated that the Immigration Judges would have broad authority to grant

voluntary departure before the conclusion of removal proceedings to assist in promptly bringing

cases to conclusion. Such authority can be generously applied."   And, *In Matter of Arguellos-*

*Campos*, *id.* at 817, the BIA also stated that an "Immigration Judge has broader authority to

grant" pre-order voluntary departure than post-order departure.

A survey of BIA opinions confirms that an immigration judge's discretion to grant or

deny pre-order voluntary departure is wide indeed.   Generally speaking, however, a judge errs

where she denies a grant of voluntary departure despite strong evidence of positive equities and

minimal negative equities.   In *In Re: Gabriela Hernandez-Mata*, 2010 WL 4500914, at *1 (BIA

Oct. 18, 2010) (citations omitted), the BIA held as follows:

> Upon our de novo review, we reverse the Immigration Judge's
> determination that the respondent failed to establish that she warrants a favorable
> exercise of discretion for voluntary departure.   The respondent, who has been in
> the United States since July 2006, has two United States citizen children and is
> active in her church where she volunteers in a program to provide clothing to
> those in need.   In denying voluntary departure in the exercise of discretion, the
> Immigration Judge noted the respondent's arrest for intoxication.   However, the
> respondent has denied that she was intoxicated and there is no showing that she
> was convicted of that charge.   While the Immigration Judge also noted the
> respondent's failure to file tax returns based on her employment, there is no
> showing that she had sufficient earnings so that she was required to do so.   The
> Immigration Judge also relied on other matters which would not have relevance to
> whether the respondent merited a discretionary grant of voluntary departure, such
> as her children's receipt of WIC benefits and her lack of a driver's license.   We
> find that the favorable factors outweigh the adverse factors of record.   In light of
> the foregoing, we find that the respondent has demonstrated that she merits
> voluntary departure in the exercise of discretion.

The converse is also true; a judge errs where she grants voluntary departure despite

strong negative equities and minimal (to non-existent) positive equities.   The BIA's opinion in *In*

*Re: Julio Adrian Murillo-Alvarez*, 2006 WL 3088893, at *2-3 (BIA Sept. 18, 2006) is

illustrative.  It reasoned, *id.* (citations omitted):

> In this case, the Immigration Judge acknowledged that "the respondent has admitted that he has been involved in drug use including marijuana and Ecstacy and alcohol and he has associated with members of a gang involved in some assaults and thefts and has been uncooperative with the juvenile Court as a ward of that Court."   However, after acknowledging these negative factors, the Immigration Judge summarily concluded that "[o]ut of consideration for the respondent's youth and his expressed intent to conform his behavior to the Immigration laws and the criminal laws of the United States and because the respondent's entire family is in the United States, I believe that the respondent is entitled to voluntary departure in the exercise of discretion."   We initially note that this statement appears to be at least in part factually incorrect, as the respondent's testimony appears to indicate that his father remains in Mexico. Furthermore, the respondent testified not merely that he was "associated with" member [sic] of a gang involved in assaults on other gang members, but that he himself was involved in such assaults.  In any case, we find that the Immigration Judge did not meaningfully weigh the significant adverse factors of the respondent's lengthy criminal history, gang associations, and failure to cooperate with law enforcement authorities (including his admission that he absconded from probation supervision) in his analysis.  Indeed, at the hearing the Immigration Judge stated that he was granting voluntary departure "primarily" due to the respondent's youth and the fact that he had "articulated an intent to reform," with no discussion as to whether or how the respondent's long history of criminal behavior and lack of cooperation with law enforcement squared with his stated intent to reform.
>
> In addition, we find that the compensating elements in this case are rather weak.  While the respondent has lived in the United States since 1996, a period of some 10 years, he has not established that he has close family ties in the United States.  The respondent is unmarried and has no children.  He testified that his mother never lived in the United States and is now deceased, and that his father remains in Mexico.  He came to the United States with a brother and sister by automobile, but has since lost contact with these siblings.  He indicated that he has a total of 6 siblings in the United States, but that only 1 sibling has lawful status, and it is unclear from his testimony whether he lives with or even is in contact with any of these siblings. …

The case relied on by the Government, *see* ECF 36 at 12, was also a case in which the

defendant's "record showed no positive equities."  *Rojas-Pedroza*, 716 F.3d at 1265 (affirming

district court's denial of collateral attack under § 1326(d) where defendant could not show prejudice).

Based on the record, Lopez-Collazo's positive and negative equities fall somewhere between the extremes recounted above.  There is no dispute that Lopez-Collazo entered the country illegally, *i.e.*, without inspection, at a young age, and that he had never been removed or otherwise processed before 2007.[26]  Defendant asserted in his briefings to the Court that he entered the United States at age sixteen, and was removed from the country in 2007, at age twenty-four.  ECF 37 at 10.  At the time of his removal, he was in a relationship with a U.S. citizen who had already given birth in this country to the couple's first child, and who was pregnant with their second child.  *Id*; ECF 24-4 at 14.  It appears that defendant was gainfully employed, and that he helped to "take care" of his family, including a stepchild, and spent a "good deal of time" with the children.  ECF 24-4 at 14; ECF 37 at 10.  He also had two Maryland felony convictions, as already described: one was for Second-Degree Assault and the other was for Theft Under $500.  Neither offense involved drugs or guns.  And, the offenses were treated leniently in the courts.  In addition, with the assault offense, he had a motor vehicle offense of driving without a license.  *See* Md. Code, Transportation Article § 16-101; *see also* ECF 24-3 at 5.

The parties dispute the seriousness of the Second-Degree Assault conviction.  The Government asserts that it "was certainly a serious criminal act," in which Lopez-Collazo "attempted to run over a police officer with a car (for which he had did not have a license) while

---

[26] Officer Kearns testified that he himself first assigned Lopez-Collazo an "A number," after Officer Kearns was unable to find any record of Lopez-Collazo in immigration databases. ECF 48 at 14-16.

drunk, and kicked and punched arresting officers after having committed theft of property from a convenience store, where he had already threatened to assault the owner … ."  ECF 36 at 11. Defendant correctly argues that the facts recited by the prosecutor in defendant's plea colloquy do not match the Government's description of the offense.  ECF 37 at 11 n.10.  There is no mention of intoxication or attempted assault on a store owner.  And, the colloquy shows that it was defendant's brother who committed theft.  ECF 24-4 at 11-12.  However, the prosecutor did state that Lopez-Collazo "attempted to leave th[e] location in the direction of" a police officer, who "was forced to jump out of the way," that he "attempt[ed] to kick and strike [police officers] with his hands," and that one of the officers would testify defendant "struck him."  *Id*. at 11.

In any event, as noted, defendant was sentenced to eighteen months' imprisonment, with all but seventy-two days suspended, and eighteen months' probation.  ECF 24-3 at 26 (Probation/Supervision Order).  This suggests that the Circuit Court judge did not regard defendant as a danger to the community.

With regard to the theft conviction, it appears that Lopez-Collazo cashed a forged check. ECF 36-1 ("Statement of Probable Cause" for arrest).  He was sentenced to eighteen months imprisonment, with all but time served suspended, and three years of probation.  ECF 24-5 at 14; ECF 24-5 at 18 (Probation/Supervision Order).  Without reference to any documents, the Government asserts that "defendant appears never to have made any restitution payments . . . ." ECF 36 at 12.  In addition, the Government claims that in 2005, defendant's probation officer "filed a notice alleging that Lopez-Collazo serially failed to report, and had changed his address without informing anyone."  *Id.* (citing ECF 36-1 at 1, 4 ("Petition for Warrant- Violation of Probation")).

Overall, then, Lopez-Collazo's case would present an immigration judge with both significant negative and positive equities.  Primarily, the immigration judge would need to balance defendant's driving offense and his two felony convictions, for which he received brief periods of incarceration, against his relationships with a U.S. citizen, one citizen child, and another citizen child on the way in 2007.  In addition, defendant had no prior illegal entry case as of 2007, and appears to have supported his family.  Although the 2007 assault conviction was recent in relation to the 2007 removal proceedings, this is because the assault case is the very offense that led to ICE's discovery of defendant, followed promptly by the removal proceedings.

Of course, an immigration judge may have denied a request for discretionary relief under these circumstances.  *See*, *e.g.*, *Matter of Serna*, 20 I. & N. Dec. 579, 580, 586 (BIA 1992) (affirming a denial of voluntary departure as a matter of discretion where the alien had a single conviction for the possession of an altered immigration document, but had been residing in the United States for seven years and intended to marry a United States citizen with whom he had a child).  On the other hand, there is a "reasonable probability" that an immigration judge would have granted defendant's request.  *See In Re: Pineda-Castellanos*, 2005 WL 3833024, at *1-2 (BIA Nov. 16, 2005) (noting immigration judge granted voluntary departure where alien had "at least 6 criminal convictions for illegal entry, battery, drunkenness, threatening, a second battery, and driving under the influence," as well as three U.S. citizen children and a questionably valid marriage to a U.S. citizen); *In Re: Felipe Sanabria-Dominguez*, 2010 WL 2601495, at *1 (BIA May 25, 2010) (reversing denial of voluntary departure where alien had "a history of repeated illegal entries," a "record of previous voluntary returns, failure to file tax returns, and driving

without a license," as well as a U.S. citizen wife and son and a record of "contributions to the community").

Accordingly, I conclude that, but for the errors complained of, there was a reasonable probability that Lopez-Collazo would have been granted voluntary departure. Therefore, he has established the prejudice component of fundamental unfairness. *El Shami*, 434 F.3d at 665; *Merino-Hernandez*, 46 F. Supp. 3d at 609; *Segundo*, *supra*, 2010 WL 4791280, at *11 (S.D. Tex.) ("The Court finds that [the defendant] has shown that there is a reasonable probability that he would have been able to challenge his classification as an aggravated felon[ ] and receive voluntary departure, thereby avoiding deportation, had he been informed of his right to be represented by counsel, his right to rebut and contest the charges, and his right to petition for judicial review. Therefore, he has met the 'actual prejudice' requirement of a collateral attack under 8 U.S.C. § 1326(d).").

## Conclusion

For the foregoing reasons, I will GRANT the Motion to Dismiss the Indictment (ECF 14). Dismissal of the indictment is appropriate where the defendant is successful in his attack on the only prior order of removal because, if the removal order is invalid, the Government "lack[s] the evidence to convict the defendant." *Rojas-Pedroza*, 716 F.3d at 1261. And, I will DENY, as moot, the Motion to Suppress (ECF 13).

A separate Order follows, consistent with this Memorandum Opinion.


Date: May 11, 2015                                  _____/s/_____
                                                    Ellen Lipton Hollander
                                                    United States District Judge